No. 24-3422

IN THE
UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
————————

IN RE: JOHN DOE,

JOHN DOE,
*Crime Victim-Petitioner*,

vs.

UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF
CALIFORNIA, SOUTHERN DIVISION,
*Respondent.*

ANASTASSIA KREZOUB, UNITED STATES OF AMERICA
*Real Parties in Interest*
————————

**DECLARATION OF ANNA TUTUNDJIAN AND EXHIBITS IN
SUPPORT OF PETITION FOR WRIT OF MANDAMUS
PURSUANT TO 18 U.S.C. § 3771(d)(3) (CRIME VICTIMS'
RIGHTS ACT)**

**EMERGENCY RELIEF REQUESTED BY JUNE 3, 2024**
————————

Douglas A. Axel (SBN 173814)
David R. Carpenter (SBN 230299)
Anna Tutundjian (SBN 309969)
SIDLEY AUSTIN LLP
350 Grand Avenue
Los Angeles, California 90071
Telephone: 213-896-6000
Facsimile: 213-896-6600
daxel@sidley.com
drcarpenter@sidley.com
atutundjian@sidley.com

*Attorneys for John Doe, Victim*

## DECLARATION OF ANNA TUTUNDJIAN

I, Anna Tutundjian, declare as follows:

1.      I am an associate of Sidley Austin LLP, which represents Crime Victim-Petitioner John Doe ("Petitioner" or "Victim")[1] in this lawsuit. I make this Declaration in support of Victim's Petition for Writ of Mandamus Pursuant to 18 U.S.C. § 3771(d)(3) (Crime Victims' Rights Act). I have personal knowledge of the facts set forth in this Declaration and, if called upon to do so, I could and would competently testify thereto.

2.      Attached as **Exhibit A** hereto is a true and correct copy of the criminal Complaint, filed on March 20, 2023.

3.      Attached as **Exhibit B** hereto is a true and correct copy of the Indictment, filed on April 18, 2023.

4.      At the urging of the government, the district court agreed to circulate a draft of its draft of the memorandum to the

---

[1] This Declaration has been filed under a pseudonym because Victim's identity has not been publicly disclosed, and the district court agreed that he may remain anonymous.

parties before issuance, seeking input on proposed redactions or other steps to protect the victim.

5.    Attached as **Exhibit C** hereto is a true and correct copy of the Government's Request to Seal and Redact the Court's Sentencing Memorandum, filed under seal on May 22, 2024 (Dkt. No. 78).

6.    Attached as **Exhibit D** hereto is a true and correct copy of Victim's Motion for Amended Sentencing Memorandum that Protects his Privacy and Dignity Pursuant to Victims' Rights Act, 18 U.S.C. § 3771, filed under seal on May 23, 2024 (Dkt. No. 82).

7.    Attached as **Exhibit E** hereto is a true and correct copy of Defendant's Partial Opposition to Replacing, Sealing, or Redacting the Court's Sentencing Memorandum, filed under seal on May 23, 2024 (Dkt. No. 84).

8.    On the Court's own motion, the Court set for hearing on May 28, 2024, the Government's Request to Seal and Redact the Court's Sentencing Memorandum, and the Victim's Motion for Amended Sentencing Memorandum that Protects his Privacy and

Dignity Pursuant to Victims' Rights Act, 18 U.S.C. § 3771. The Court heard oral argument from parties and issued an order that same day.

9.      Attached as **Exhibit F** hereto is a true and correct copy of the Government's presentation from the May 28, 2024 hearing.

10.     In connection with the Sentencing Memorandum, Victim submitted a motion in support of sealing that explained why it should be permitted to file some of those documents under seal: (1) Victim's Unopposed Ex Parte Application for Order Sealing Victim's Motion for Amended Sentencing Memorandum that Protects his Privacy and Dignity Pursuant to Crime Victims' Rights Act, 18 U.S.C. § 3771; (2) Supporting Exhibit ("Ex Parte Application") (Dkt. 80). The District Court granted Victim's Ex Parte Application. Dkt. No. 81. The District Court also ordered that the following documents be sealed: (1) Government's Request to Seal and Redact the Court's Sentencing Memorandum, (Dkt. No. 78) and (2) Defendant's Partial Opposition to Replacing, Sealing, or Redacting the Court's Sentencing Memorandum (Dkt.

No. 83). In addition, the District Court sealed the May 28, 2024 hearing on the Government's Request to Seal and Redact the Court's Sentencing Memorandum, and the Victim's Motion for Amended Sentencing Memorandum that Protects his Privacy and Dignity Pursuant to Victims' Rights Act, 18 U.S.C. § 3771.

11.     Attached as **Exhibit G** hereto is a true and correct copy of the District Court's Order denying in substantial part the Government's Request to Seal and Redact the Court's Sentencing Memorandum, filed on May 28, 2024 (Dkt. No. 87).

12.     Attached as **Exhibit H** hereto is a true and correct copy of the District Court's Sentencing Memorandum, filed under seal on May 28, 2024 (Dkt. No. 88).

I declare under penalty of perjury under the laws of California and the United States of America that the foregoing is true and correct.

Executed on May 31, 2024.

/s/ Anna Tutundjian
Anna Tutundjian

## CERTIFICATE OF SERVICE

I hereby certify that I submitted the foregoing for filing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by email to efilerhelp@ca9.uscourts.gov on the 31st day of May.

I certify that all participants in the case were served via email.

I declare under penalty of perjury that the foregoing is true and correct. Executed on May 31, 2024.

*/s/ David R. Carpenter*
David R. Carpenter

# EXHIBIT A

AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | |
| ANASTASSIA KREZOUB, | Case No.  8:23-mj-00164-DUTY |
| Defendant(s) | |

FILED
CLERK, U.S. DISTRICT COURT
3/20/2023
CENTRAL DISTRICT OF CALIFORNIA
BY: *Valencia Munoz* DEPUTY

LODGED
CLERK, U.S. DISTRICT COURT
3/20/2023
CENTRAL DISTRICT OF CALIFORNIA
BY: CO        DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of December 5, 2021 through January 31, 2023 in the county of Orange in the Central

District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2261A(2)(B) | Stalking |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

*/s/ Steven C. Wrathall*
Complainant's signature

Steven C. Wrathall, FBI Special Agent
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:       3/20/23

Judge's signature

City and state:   Los Angeles, California

Hon. Charles F. Eick, U.S. Magistrate Judge
Printed name and title

AUSA Andrew M. Roach, (213) 894-0306

**AFFIDAVIT**

I, Steven C. Wrathall, being duly sworn, declare and state as follows:

## I.   BACKGROUND OF AFFIANT

1.   I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been so employed since February 2009.  I have worked on the FBI's Violent Crimes squad in Orange County since 2012 and have experience working a variety of violent crime offenses, including crimes involving children, fugitives, death threats, and murder for hire, among others. I am also currently assigned to the Orange County Violent Crime Task Force, which is composed of federal and local law enforcement agencies and is responsible for, among other things, locating violent fugitives and investigating violent crime.

## II.  PURPOSE OF AFFIDAVIT

2.   This affidavit is made in support of a criminal complaint and arrest warrant for ANASTASSIA KREZOUB ("KREZOUB") for a violation of 18 U.S.C. § 2261A(2)(B) (Stalking).

3.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, all amounts or sums are

approximate, and all dates and times are on or about those
indicated.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

4.    The FBI is investigating ANASTASSIA KREZOUB for
stalking a victim residing within the Central District of
California (the "victim").  Between August 2021 and November
2021, KREZOUB, a then-resident of Boston, Massachusetts, and the
victim had a brief romantic relationship, seeing each other when
the victim would visit Boston.  In October and November 2021,
however, the relationship changed when KREZOUB started to accuse
the victim of taking photos of her without her permission, and
request the victim buy her expensive gifts and other items.
When the victim did not comply with the requests, KREZOUB began
to send threatening and harassing text messages and voicemails.

5.    The victim attempted to cut contact with KREZOUB in
December 2021.  He blocked her known numbers and did not respond
to her text messages or voicemails.  Nonetheless, KREZOUB
continued to send threatening messages and voicemails to the
victim for well over a year, including through the present day,
through various different phone numbers and via email.  Between
December 2022 and early January 2023 alone, KREZOUB sent
approximately 7,900 harassing text messages to the victim,
despite receiving no response from the victim.  In addition,
KREZOUB sent harassing messages to the victim's employer and
filed two police reports against the victim, first alleging that
he took photos without her consent and, later on, alleging that
the victim sexually assaulted her.

6. In late January 2023, the victim reinitiated contact with KREZOUB at the FBI's request. This was the first communication that the victim sent KREZOUB in approximately a year. During subsequent communications, KREZOUB requested that the victim give her gifts to avoid further damage to his or his family's reputation.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

7. Based on my interview of the victim, my review of documents and materials provided by the victim and his counsel, and my review of the other relevant documents, I am aware of the following information:

A. <u>The Victim's Relationship with KREZOUB</u>

8. The victim met with the FBI and provided the following chronology of his relationship with KREZOUB as well as extensive text messages documenting their text conversations:

a. On August 24, 2021, the victim met KREZOUB in the lobby of a hotel in Boston, Massachusetts. At the time, the victim -- a wealthy businessman from Southern California -- was visiting Boston. The victim described KREZOUB as a sophisticated, multi-lingual, and well-traveled Ukrainian woman between 26 and 30 years old. KREZOUB and the victim spoke for approximately an hour in the hotel lobby, exchanged phone numbers, and agreed to go to dinner.

b. A few days later, the victim and KREZOUB had dinner at a Boston restaurant. After dinner, KREZOUB and the victim returned to his hotel room where he reported that they had consensual sex. The victim reported that KREZOUB gave no

indication that she did not want to have sex, nor did he give her any money for sex. Over the next few days, the victim and KREZOUB met approximately three or four times and continued their dating relationship while he was in Boston. They had consensual sex on one or two additional occasions.

      c.    The victim returned to Boston again in September and October 2021. During these visits, the victim met KREZOUB a handful of times for dinners and dates. They also had consensual sex on approximately two to four more occasions. The victim reported that all of their sex was consensual. He further stated that he never paid KREZOUB for any sex, nor did he engage in anal sex with KREZOUB.

      d.    The victim and KREZOUB also exchanged texts and calls with each other during this time, including when they were apart.

      e.    Around the end of October or early November 2021, the victim started to question KREZOUB's motivations as she began to ask him to purchase expensive items for her. The victim reported that he never gave KREZOUB any gifts or money, however, he paid for dinners when they went out and purchased her flowers once. The victim reported that KREZOUB never specifically demanded money during their brief relationship. Instead, she requested expensive gifts such as jewelry. At that point, the victim began to think that she might be trying to scam him. The victim reported that he was in the process of getting a divorce when he met KREZOUB. He stated that financial documents showing his approximate net worth were publicly filed

4

in his divorce in October 2021.  The victim believed that
KREZOUB obtained those documents as he stated that KREZOUB later
referenced his divorce filings in harassing messages and
voicemails.

     f.   In November 2021, KREZOUB's tone and demeanor
toward the victim in her text messages and phone calls changed.
She began to become hostile towards him.  She also accused the
victim of taking photos of her without her consent.  The victim
denied ever doing so.

     g.   In December 2021, KREZOUB filed a police report
with the Boston Police Department alleging that the victim had
taken pictures of her without her permission.  In his interview
with the FBI, the victim denied ever taking photos of KREZOUB
without her consent.

     h.   In approximately mid-December 2021, the victim
blocked KREZOUB's phone number in response to her harassing
behavior.  But after blocking KREZOUB's phone number, the victim
began receiving similar text messages from other phone numbers.
The messages were similar in tone and tenor, leading him to
believe that the sender was KREZOUB.  The victim continued to
block these new phone numbers.  Each time the victim blocked a
phone number, however, he would receive similar messages from
different numbers or email accounts, leading him to believe that
KREZOUB was sending him messages by frequently acquiring new
numbers or accounts.

     i.   In approximately December 2021, the victim's
adult daughter and his ex-wife told him that they had been

contacted on social media by individual(s) purporting to be the victim.  The victim reported that he did not create the social media accounts and he believed that KREZOUB had created these accounts.  The victim also reported that his ex-wife was contacted by someone pretending to be the victim via email.

j.   The victim reported that the last communication that he sent KREZOUB on his own initiative was sometime in December 2021.[1]  Despite the victim stopping all communications with KREZOUB around that time, the victim continued to receive harassing messages and voicemails from KREZOUB.  The victim estimated that he received thousands of unanswered texts and hundreds of unanswered voicemails from KREZOUB.

9.   The victim and his counsel provided the FBI with screenshots, a 903-page phone extraction report containing text messages the victim exchanged with KREZOUB, recorded voicemails from KREZOUB, and two separate data extractions from his personal cell phone containing the complete text chains with KREZOUB, as well as approximately 186 recorded voicemails.  I have reviewed these materials, which corroborate the victim's brief relationship with KREZOUB, the abrupt change in KREZOUB's behavior, and her numerous harassing messages.  Examples of the communications I reviewed include the following:

a.   In late August 2021, KREZOUB, texting from a phone number ending in 5969 ("the 5969 phone number"), and the victim exchanged text messages discussing dinner dates.  The

---

[1] As discussed more fully below, the victim reinitiated communication with KREZOUB in late January 2023, at the FBI's request, by responding to her repeated texts.

tone of the messages was friendly and flirtatious.  For instance, on August 24, 2021, the victim and KREZOUB exchanged introductory texts.  Four days later, KREZOUB wrote, "Thinking about how much fun we had last night. . . would love to see you again, but don't want to rush things."  Multiple texts were exchanged about dinner plans and their dates.  On August 29, 2021, the victim wrote, "Miss you already.  Have a great rest of the weekend."  KREZOUB responded, "Have safe travels, I miss you."

     b.   Between September and October 2021, the victim and KREZOUB exchanged additional texts in which they chatted, exchanged flirtatious messages, and discussed the victim's future trips to Boston.  KREZOUB sent texts like, "Miss u" and "Do you know how cute you were falling asleep, I think I should've taken a picture too!  Let's call some time soon baby." KREZOUB also expressed excitement at the victim's pending visits.  KREZOUB, for example, sent a text message on October 19, 2021, stating, "Are you in Boston soon to keep me warm?"

     c.   Approximately two hours after KREZOUB sent the above message, KREZOUB then texted the victim, "Delete the naked photos please.  I never gave anybody permission."  The victim responded, "There are no photos."  The victim continued, "There are no photos.  And no[,] don't know your point."  KREZOUB, however, continued to text the victim accusing him of taking photos of her without her permission, which the victim repeatedly denied.  At one point, the victim stated, "No.  Sorry you are wrong and I will press charges if I need too."  The

victim later wrote, "Nonsense.  Stop your [i]llegal nonsense and extortionist behavior or will have to take legal action."  He continued, "No.  Do you try to extort on a routine basis?  Do you pay taxes?"

      d.    After the above interaction there appeared to be a three-week break in the text messages.  KREZOUB reinitiated contact on November 11, 2021.  KREZOUB and the victim both apologized for their previous statements.  KREZOUB told the victim, "Trust me you're beyond amazing."

      e.    In late November 2021, KREZOUB and the victim discussed her potentially traveling to Southern California.  She texted the victim, "I prefer shopping, does Fashion Island in Newport ha[ve] a jewelry and dress stores?  Will definitely put me in a pleasant mood!!"  The victim did not respond to this text.  KREZOUB then sent dozens of additional texts in quick succession disparaging the victim and his family.  KREZOUB wrote, "Want to fuck?  Call Amex we go shopping or otherwise go meet some bitch . . . ."

      f.    According to the victim, KREZOUB never traveled to Southern California and the last time he saw her in person was around October 2021.

      g.    Between late November and December 2021, KREZOUB, continuing to use the 5969 phone number, sent the victim hundreds of harassing texts.  For example, she sent messages calling the victim a "bitch" and stating, among other things, "You should pay me," "Fuck you, I don't fuck for dinner," and she continued to disparage his family.

h.   The victim responded to a few of KREZOUB's texts and told her to stop sending him messages.  For example, on December 5, 2021, the victim texted, "Stop abusing me.  Stop abusing me.  Stop.  Get out your unhealthy fire breathing self for a few minutes. . . .  And get some help before you hurt yourself or some one else."

i.   Between December 12 and December 14, 2021, the victim started to receive new harassing texts from phone numbers ending in 6066 ("the 6066 phone number"), 8880 ("the 8880 phone number"), and 5657 ("the 5657 phone number").  The content of the messages was similar to those received from KREZOUB on the 5969 phone number.  Below are some additional examples:

i.   On December 13, 2021, the victim received a text from the 6066 phone number stating, "You have my address babe?  I need new Chanel bag in pink I don't F with broke. . . . I'm too pretty for this treatment."  Later on, she wrote, "Never had problems being complaint.  Depends what I'm offered."

ii.  On December 14, 2021, the victim received a text from the 8880 phone number stating, "You think I make scandals to men who treat me properly? . . .  You should pay me to have sex . . . .  Fuck you . . . .  I'll find your enemies and will be very friends with them."

iii. On December 15, 2021, the victim received a text from the 5657 phone number stating, "Real men show what they are worth to a woman to earn her respect . . . .  And you don't even pick me up or offer a fur when I'm cold or new earrings when I kindly ask."

     j.    The victim did not respond to these texts.

     k.    Seven days later, on December 20, 2021, victim received a text from the 6066 phone number, which included a portion of a report naming the victim as a suspect in a domestic violence case.  The text stated, "Go pick up your police report."  The victim responded, "No YOU are the criminal.  You are going to pick up your report.  Liar.  Illegal con artist. Swindler and 100 times worse.  You try extortion.  Sorry. Illegal here.  Go away.  Go back to where you can do these things and where people accept it.  Not here."

     l.    On December 15, 2021, the victim received text messages from the email address of anastassiausa@icloud.com stating, "You come off as someone who's paying the life of an old ex, lol, I'm too much and out of your league to fuck for food, take a bitch to dinner to fucl [sic].  You don't deserve me, look at me?  You're jealous men look at me when we're out."

     m.    Also, on December 16, 2021, the victim started to receiving harassing texts from the email address of laradesa06@gmail.com, stating:

> I regret I had sex with you because of the way you
> treat me after . . . .  Not even a decent date . . . .
> I am sorry, but I was not pleased meeting someone who
> comes empty handed and doesn't take care of me
> properly . . . .  If you want to keep seeing me even
> casually, we can talk about my maintenance, rent,
> beauty and shopping expenses I need to be beautiful to
> meet.  Otherwise, plenty of very successful men will
> be happy to take care of their dear and keep her sweat
> and tight.  I don't want to waste myself.  sorry. .
> . .  I don't feel your love at all with me. . . .  I
> cannot have sex with every man who wants me, men wh0o
> send me 500 roses or offer me trips, maybe I should
> accept because you neglect me. . . .  And I asked like
> a small gift you tell me to F off.

n.    On December 21, 2021, the victim texted the following in response:

> Stop abusing me and lying all the time. I don't know what is wrong with you. Stop and leave me alone. Have said many times before. Do not contact me again. And do not menace me or family again. And do not troll[.] Just stop and go find somebody else to play your problems out on.

The victim later texted, "I keep blocking numbers but you keep faking. Surely there are more Men you can abuse." Later, KREZOUB texted the victim stating that he anally raped her.

o.    KREZOUB continued to text the victim in a similar manner and state that he anally raped her.

p.    KREZOUB also left recorded voicemails to a similar effect. I have listened to some of these recordings and the content is similar to the text messages.

B.    Victim Sends a Cease-and-Desist Letter to KREZOUB

10.   The victim reported that his attorney emailed a cease-and-desist letter to KREZOUB on December 27, 2021. Based on my review of the letter, it was emailed to KREZOUB at the following email addresses: laradessa06@gmail.com, anastassiakrez@gmail.com, and anastassiausa@icloud.com. The letter demanded KREZOUB stop sending harassing messages to the victim and his family, expressly told her that "any and all communication from [her] is unwanted" and must stop, and warned that the victim would pursue legal action if KREZOUB did not cease her threatening communications.

11.   The victim's counsel provided me with several email responses to the cease-and-desist letter from

anastassiakrez@gmail.com, dated December 27, 2021, January 18, 2022, February 22, 2022, February 23, 2022, and March 12, 2022. As an example, on February 23, 2022, anastassiakrez@gmail.com sent a response to the cease-and-desist letter stating, "I am allowed to talk about being raped . . . . Alright I'm getting the story to the press and media." On March 12, 2022, anastassiakrez@gmail.com sent a response stating, "Are you kidding me? Have you seen him naked?"

12.   KREZOUB continued to send harassing texts to the victim notwithstanding the cease-and-desist letter. For example, the texts the victim provided to the FBI show that the victim received hundreds of additional harassing texts after the cease-and-desist letter had been sent to KREZOUB in December 2021. Below are some additional examples:

a.   On June 29, 2022, the victim received text messages from the 5657 phone number stating:

- ██████████████████████
- "I want to see you cry, suffer,"
- ████████████████████████████████
  ███████
- "I want to commit suicide,"
- "You are about to live your worse nightmares,"
- ████████████████████████████████
- █████████████████████████████████████
  █████████████
- ██████████████████████████████████████
  ████████████████████



- ▪ "YOUR nightmares are about to start since you asked for it,"

                                                     and

   b.    On June 29, 2022, the victim also received back-to-back text messages from the 5657 phone number that read, "Get out of the building" and "Before it gets blown up LOL."

   c.    On June 30, 2022, the victim received a text message from the 5657 phone number that stated, "Yes buy me Chanel bitch if you want me to get excited to see you, bitch! . . . . Only thing that excite me is kick your ASS . . . . Burn your house in [city]."

   d.    More recently, on December 1, 2022, the victim began receiving texts from a phone number ending in 2575 ("the 2575 phone number"). Between December 1, 2022, and January 13,

2023, the victim received approximately 7,900 harassing text messages from the 2575 phone number.  Below are some examples:

       i.   Multiple photos of a close-up picture of a human rectum.

       ii.  Multiple photos of graphic pornographic images.

       iii. Multiple text messages referencing graphic sex acts with members of the victim's family.

       iv.  Multiple messages threatening reputational damage against the victim and his family.  For example, on December 3, 2022, the victim received text messages that stated, "All of you will be embarrassed on fucking National TV . . . . CNBC, CNN, Bloomberg, Yahoo TV."

    C.   <u>The Victim and His Employer Receive Harassing Emails</u>

    13.  In addition, both the victim and his employer reported that they began to receive harassing messages from various email accounts in June 2022.  These emails were believed to be from KREZOUB based on their similarity in tenor and tone and references to past events, such as her prior text messages.  The victim and his employer provided me with copies of these emails, which I have reviewed.  Below are examples of emails that the email address of laradesa06@gmail.com sent to the victim and others at his employer:

       i.   On August 31, 2022, laradesa06@gmail.com sent an email to the victim's employer, titled "[Victim's first and last name] | SEXUAL ASSAULT BATTERY, solicitation, audio depositions."  The email contained screenshots of a police

report filed with the Boston Police Department, dated December 16, 2021, alleging that the victim had taken non-consensual nude photos of KREZOUB and had threatened to have her kicked out of the country.

ii.  On September 11, 2022, laradesa06@gmail.com sent an email to the victim's employer, titled "[Victim's first name] solicits to prostitution girls . . . ."  The email contained screenshots of text messages between KREZOUB and the victim, a pornographic image of male genitalia, and a screenshot of a portion of the Boston Police Department report.  The body of the email included the following text: "I never consented to meet for sex at any hotel.  I was so drunk every time we met he would make me drink and take me to his room for unprotected sex. One of the last time I met him, he grabbed my wrist and forced himself inside of me, forcing me to anal sex, because 'I didn't wanted it.'  If I wasn't afraid for my life at that hotel room and scared of him hitting me, I would've defended myself."

iii. On November 19, 2022, laradesa06@gmail.com sent an email to victim's employer, titled "[Victim's first name] LOVES ANAL AND ** POOP FETISHES."  This email contained a pornographic image of two men engaging in sexual activity.

iv.  On January 12, 2023, laradesa06@gmail.com sent an email to victim's employer, titled "[Victim's first and last name] RAPED MY BRUTALLY."  The email read, "HE FORCED ME TO ANAL VAGINAL ANAL WITHOUT ANY PROTECTION WITHOUT EVEN LUBRICANT OR PREPARING ME ONE DAY HE WAS ANGRY AT ME FOR RESISTING HE

GRABBED ME I WAS NOT ABLE TO MOVE BUT JUST LET HIM SODOMIZE ME
UNTIL HE FINISH."

    D.    <u>KREZOUB's Police Reports Against the Victim</u>

    14.    The victim reported to me that KREZOUB filed multiple
false police reports against him.  As part of the investigation,
I reviewed copies of these police reports.

    15.    The first police report that KREZOUB filed against the
victim was on December 16, 2021, with the Boston Police
Department.  This report matches the police report that KREZOUB
referenced in her texts to the victim in December 2021.
According to the report, KREZOUB walked into the police station
and reported that on her third date with the victim, "[S]he
awoke to him taking photos of her while she was sleeping in the
nude."  The report further stated that KREZOUB said that when
"she attempted to break up with [the victim, he] stated he 'will
get people to her home FBI and police' and that he 'will find
her family and have them kicked out of the country.'"  KREZOUB
made no mention of rape or any other form of sexual abuse in her
police report.

    16.    KREZOUB filed a second police report against the
victim on March 23, 2022, with a local police department in
Southern California.  According to the police report, KREZOUB
stated that the victim took nude photos of her without her
consent.  KREZOUB also stated that the victim attempted to have
anal sex with her against her will.  The reporting officer's
report also included a note regarding KREZOUB, specifically

stating that her "timeline and recount of the incidents did seem unclear and illogical at times."

17.   Based on my communications with both the Boston Police Department and the local police department in Southern California, neither are investigating these complaints against the victim.

E.   FBI Interviews KREZOUB

18.   As part of the investigation, FBI agents from the Miami Field office telephonically interviewed KREZOUB on September 13, 2022, and November 13, 2022.   I have reviewed both of those interview reports and summarize them below.

19.   During her September 13, 2022 interview with the FBI, KREZOUB stated the following:

a.   KREZOUB reported that she was a French national who has been living in the United States since 2018.   She mentioned that she previously lived in Boston, Massachusetts and Miami, Florida but was presently residing in San Francisco, California.   KREZOUB stated that she worked in fashion e-commerce.

b.   KREZOUB stated that she met the victim in late August 2021 at a restaurant bar in Boston, Massachusetts. KREZOUB stated they conversed for several hours over drinks and that the victim asked her to come to his hotel room and offered her money, but she refused.   KREZOUB stated the victim texted her days later, inviting her to his hotel room.   KREZOUB stated that she refused again.   She mentioned that she met the victim for dinner.   Following dinner, KREZOUB stated she returned to

17

the victim's hotel room and they had sex.  KREZOUB stated that the victim paid her $400 to $500 for sex.  KREZOUB stated she went to dinner with the victim again a few days later and they had sex again.

c.  KREZOUB stated that in September 2021, after a night out with the victim, she woke up to the victim taking pictures of her.

d.  KREZOUB stated that in October 2021 she went on another date with the victim.  On this occasion, she reported that the victim sexually assaulted her in the morning with "forced penetration."  KREZOUB reported breaking off their relationship after that incident.

e.  KREZOUB reported that she saw the victim a total of five or six times between August and October 2021.  She reported that the victim paid for all meals, sometimes over $1,000 per meal, and paid her $400 to $500 one time for sex.

f.  KREZOUB reported that she filed a Boston Police Department report in December 2021 relating to the victim purportedly taking pictures of her.  She stated she did not tell the police about the sexual abuse at that time as, according to her, she did not want to report everything during the first report.  KREZOUB reported later informing the Boston Police Department about the sexual assault.[2]

g.  KREZOUB stated that the victim threatened her in October 2021, after she sent him a message to delete the photos

_____

[2] I am in the process of requesting all other reports from the Boston Police Department which KREZOUB may have filed against the victim, to the extent they exist.

that he took of her. KREZOUB mentioned that the victim was scared he would lose his job if sexual assault allegations were made against him. KREZOUB stated that she provided the Boston Police Department with screenshots of purportedly threatening texts but that the victim threatened her more often over the phone rather than in text.

      h.    KREZOUB acknowledged that the victim's attorney sent her a letter stating she made threats against the victim. KREZOUB, however, denied ever threatening the victim.

      20.    FBI agents telephonically interviewed KREZOUB again on November 7, 2022. During the interview, KREZOUB stated the following:

      a.    KREZOUB stated that she called the FBI to complain that the victim had taken nude photos of her and that she filed multiple police reports against the victim.[3] She said that she was told that no one could help her.

      b.    She stated that was in contact with a local detective in Southern California but declined to provide any more information.

      c.    KREZOUB refused to provide the FBI with her current address and stated that she did not want the FBI to investigate her complaint against the victim any further.

---

[3] I have reviewed FBI records and I did not find any complaint made or filed by KREZOUB.

F.    Further Investigation into KREZOUB Reveals Other
      Potential Stalking Victims

21.    During my investigation into KREZOUB, I identified
other potential stalking victims, including victims in Florida
and Boston, Massachusetts.

   a.    Potential Florida Victim

         i.    As part of his referral to law enforcement,
the victim provided the FBI with a report on KREZOUB that was
prepared by a private investigation firm.  The investigation
firm identified a man in Florida as another subject of potential
stalking by KREZOUB (the "Florida Victim").  The investigative
report included online postings about the Florida Victim that
included the email address of laradesa06@gmail.com.

         ii.    I located and reviewed a request for a
domestic violence restraining order that the Florida Victim
filed against KREZOUB in Florida state court.  Based on the
filing, the Florida Victim reported having a brief relationship
with KREZOUB in 2019.  After their relationship ended, the
Florida Victim reported that KREZOUB stalked him on a daily
basis for over a year.  The Florida Victim reported that KREZOUB
later emailed him and demanded money and defamed the victim's
character.

         iii. I attempted to interview the Florida Victim.
The Florida Victim, however, declined to speak with me and
indicated he had moved on with his life.

b.  Potential Boston Victim

i.  I also recently learned of another report of threatening behavior against KREZOUB.  This report came from the Boston Police Department, which provided me with a copy of the police report detailing the activity.  According to the Boston Police Department report, dated January 20, 2023, a Boston-area hotel filed a police report against "Anatasa Krezoub," who is believed to KREZOUB, for threatening its employees.  The hotel reported that the subject had contacted the hotel multiple times from the 5969 phone number and the email address of laradesa06@gmail.com.[4]  The hotel reported that the subject made, among other threats against hotel employees, the following statements:

- "I have the means to find anything I want, and destroy your life . . . ,"

- "I will go after you if I want to,"

- "Take a shower your hair is greasy nasty Arab,"

- "Ill come fuck you up if you talk to me like that nasty Arab," and

- "Don't fuck with me."

ii.  I have not interviewed the hotel employees or victims of these threats to date.

iii. On March 16, 2023, the investigating detective from the Boston Police Department contacted me to

---

[4] Both this phone number and email address sent multiple threatening communications to the victim, as discussed above.

Case: 24-3422, 05/30/2024, DktEntry: 1.2, Page 30 of 50
Case 8:23-cr-00042-CJC  Document 11  Filed 03/20/23  Page 23 of 26  Page ID #:171

inform me that KREZOUB was still sending harassing messages to victims in Boston.

    G.   <u>The Phone Numbers and Email Addresses Used to Stalk the Victim Come Back to KREZOUB</u>

22. Subscriber records received from Google for the email addresses of anastassiakrez@gmail.com and laradesa06@gmail.com show "Anastassia Krezoub" (KREZOUB) as the billing name associated with a Google Pay account connected to these email addresses.

23. Similarly, records received from Apple show that the iCloud account anastassiausa@icloud.com was registered to an email address of laradesa06@gmail.com, and a person with the first name of "Anastassia," the last name of "K," and the 5969 phone number.

24. Records received from AT&T Wireless showed that the 5969 phone number was subscribed to "Anastassia Krezoub" (KREZOUB) since November 12, 2020 at an account address in Boston, Massachusetts.

25. Records from Bandwidth.com showed that the 5657 phone number was assigned to Ad Hoc Labs, Inc. doing business as Burner ("Burner"). Records subsequently received from Burner showed that the 5657 phone number was created and used by the 5969 phone number (registered to KREZOUB) between the dates of January 6, 2021, and November 3, 2022.

26. I determined that the 6066 phone number, the 8880 phone number, and the 1480 phone number were assigned to

Bandwidth.com and Intelliquent.  I am in the processing of requesting further subscriber records from those companies.

   H.   The Victim Reinitiates Contact with KREZOUB at the
        FBI's Request

   27.   In late January 2023, the victim reinitiated contact with KREZOUB at the 2575 phone number at the request of the FBI. During these communications, KREZOUB stated she would stop harassing the victim if she received various luxury items and "monthly support."  Below is a summary of the recent text conversation the victim had with KREZOUB, which were provided to me via a new digital extraction from the victim's cellphone.

   28.   On January 25, 2023, the victim and KREZOUB had the following text message conversation:

| | |
|---|---|
| [VICTIM]: | I need this to stop.  You tell me what it takes and I need to know it all stops forever for me and family.  And what assurances can you give to stop? |
| [KREZOUB]: | Ok.  I will. |
| [KREZOUB]: | When I'm happy it's easy for me to shut up. |
| [VICTIM]: | I do not know what will make you happy. What will make you happy?  I need an action item What is it and how will I know you will stop and leave me and family alone? |
| [KREZOUB]: | I don't know what I can ask you.  What can I do so you are assured. |
| [VICTIM]: | I don't know.  You need to tell me what will make you happy.  And rest is after that. |
| [KREZOUB]: | Action Item of things that make me happy, guaranteed to keep me happier and/or will keep me happiest ever: |

23

                        * Multiple Hermès bags of my choice (example : Black Birkin in Alligator 30, Gold Brown Birkin 25, Constance bag 18 in Alligator)

                        * Lady Dior size Small Alligator Finish in Blush color with Crystal Hardware

                        * Patek Philippe Watch 24H model Women's Rose Gold Diamond Bazel

                        * Vacherin Constantin Watch Women's Overseas Quartz Pink Gold

                        * Audemars Piguet Royal Oak Women's Rose Gold 33mm Frosted Finish

                        * Diamond Earrings + Diamonds Tennis Bracelet from Tiffany

                        * Cash for minor Rhinoplasty from Dr. [Name]

                        * Gold Bars

                        * Condo in Boston and/or Miami

                        * Newest Mercedes car

                        * Pomeranian Spitz Female Puppy + dogsitter & insurance fees

              Feel Free to pick from this list.

              [. . .]

   [KREZOUB]:      This or sex scandal at your kids graduation.

    29.  On January 31, 2023, the victim, at the request of law enforcement, made a recorded call to KREZOUB, which I have reviewed.  During the call, the victim asked if KREZOUB "would leave [him] and [his] family alone" if he gave her the requested items.  KREZOUB agreed.

30.  Most recently, the victim's attorney reported to me that KREZOUB has continued to send threats to the victim, including threats of physical violence and reputational damage against the victim and his family.

## V.  CONCLUSION

31.  For all the reasons described above, I submit there is probable cause to believe that KREZOUB violated 18 U.S.C. § 2261A(2)(B) (Stalking).


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 20th day of
March, 2023.

_____
THE HONORABLE CHARLES F. EICK
UNITED STATES MAGISTRATE JUDGE

# EXHIBIT B

```
                                        F I L E D
                                  CLERK, U.S. DISTRICT COURT

                                       4/18/2023

                                 CENTRAL DISTRICT OF CALIFORNIA
                                 BY: _____TV_____ DEPUTY
```

1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                FOR THE CENTRAL DISTRICT OF CALIFORNIA

10                      January 2023 Grand Jury

11  UNITED STATES OF AMERICA,          SACR   8:23-cr-00042-CJC

12          Plaintiff,                 I N D I C T M E N T

13          v.                         [18 U.S.C. § 2261A(2)(B),
                                       2261(b)(5): Stalking;
14  ANASTASSIA KREZOUB,                18 U.S.C. § 875(d): Transmitting
      aka "Sylvia Kass,"               Interstate Communications with
15                                     Intent to Extort]
            Defendant.
16

17       The Grand Jury charges:

18                            COUNT ONE

19            [18 U.S.C. §§ 2261A(2)(B), 2261(b)(5)]

20       1.   Beginning on or about November 29, 2021, and continuing to

21  March 23, 2023, in Orange County, within the Central District of

22  California, and elsewhere, defendant ANASTASSIA KREZOUB, also known

23  as "Sylvia Kass" ("KREZOUB"), with the intent to harass and

24  intimidate the Victim, used an interactive computer service, an

25  electronic communication service, an electronic communication system

26  of interstate commerce, and other facilities of interstate and

27  foreign commerce, namely email, interstate wires, and the Internet,

28  to engage in a course of conduct, described in paragraph 2 below,

1   that caused, attempted to cause, and would reasonably be expected to

2   cause substantial emotional distress to the Victim.

3       2.   Defendant KREZOUB's course of conduct included, among other

4   things, the following:

5           a.   On or about November 29, 2021, defendant KREZOUB

6   texted the Victim and demanded that he take her shopping.

7           b.   Between on or about November 29, 2021 and December 11,

8   2021, defendant KREZOUB sent the Victim hundreds of harassing texts

9   that disparaged the Victim and other individuals.

10          c.   On or about December 12 and December 14, 2021, after

11  the Victim told defendant KREZOUB to stop contacting him, defendant

12  KREZOUB started to send harassing texts to the Victim from three

13  different phone numbers.

14          d.   On or about December 14, 2021, defendant KREZOUB

15  texted the Victim, stating, "You think I make scandals to men who

16  treat me properly?" and "I'll find your enemies and will be very

17  friends with them."

18          e.   On or about December 16, 2021, defendant KREZOUB filed

19  a police report against the Victim, accusing him of taking photos

20  without her consent.

21          f.   On March 23, 2022, defendant KREZOUB filed a second

22  police report against the Victim, accusing him of a crime.

23          g.   On or about June 29, 2022, defendant KREZOUB texted

24  the Victim threats to injure another person and back-to-back text

25  messages stating, "Get out of the building" and "Before it gets blown

26  up LOL."

27

28

1          h.   On or about June 30, 2022, defendant KREZOUB texted

2     the Victim a message, stating, "Only thing that excite me is kick

3     your ASS . . . .  Burn your house in [city]."

4          i.   On or about August 31, 2022, defendant KREZOUB sent

5     the Victim's employer an email, titled "[Victim's first and last

6     name] | SEXUAL ASSAULT BATTERY, solicitation, audio depositions,"

7     which contained screenshots of a police report defendant KREZOUB

8     filed against the Victim.

9          j.   On or about September 11, 2022, defendant KREZOUB sent

10    the Victim's employer an email, titled "[Victim's first name]

11    solicits to prostitution girls . . . . ," which contained screenshots

12    of text messages between KREZOUB and the Victim, a pornographic image

13    of male genitalia, and a screenshot of a portion of the police report

14    defendant KREZOUB filed against the Victim.

15         k.   On November 19, 2022, defendant KREZOUB sent the

16    Victim's employer an email, titled "[Victim's first name] LOVES ANAL

17    AND ** POOP FETISHES," which included a pornographic image of two men

18    engaging in sexual activity.

19         l.   On or about December 3, 2022, defendant KREZOUB texted

20    the Victim a message threatening his reputation, stating, "All of you

21    will be embarrassed on fucking National TV . . . .  CNBC, CNN,

22    Bloomberg, Yahoo TV."

23         m.   On January 12, 2023, defendant KREZOUB sent the

24    Victim's employer an email, titled "[the Victim's first and last

25    name] RAPED MY BRUTALLY."

26         n.   On or about January 25, 2023, defendant KREZOUB texted

27    the Victim a message demanding that the Victim buy her luxury items

28    or else he would face a "sex scandal at your kids graduation."

3

1    o.   On or about February 8, 2023, defendant KREZOUB texted
2  the Victim a message, stating, "Condo or I fuck up your life."

3    p.   On or about February 14, 2023, defendant KREZOUB
4  texted the Victim a message, stating, "I want $1M minimum of gifts.
5  Or i fuck the shit off you embarrassing the fuck out of your ass."

6    q.   On or about March 1, 2023, defendant KREZOUB texted
7  the Victim a message, stating, "I want a condo.  If I file a lawsuit
8  against you, you will never work anywhere. . . .  Not even McDonald's
9  would hire you."

10    r.   On or about March 4, 2023, defendant KREZOUB texted
11  the Victim a message, stating, "I'm better than a Porsche, give more.
12  Spend more on me than on a car fucker.  Or I fuck the shit out of
13  your life.  I'm not kidding you at all."

14    s.   On or about March 16, 2023, defendant KREZOUB sent the
15  Victim a text message, stating, "You want another round of emails at
16  [Victim's employer]?  . . . .  How did it go at [Victim's employer]
17  when they received the emails?  Would have LOVED to see your face."

18
19
20
21
22
23
24
25
26
27
28

COUNT TWO

[18 U.S.C. § 875(d)]

Beginning on or about February 8, 2023, and continuing until on or about February 11, 2023, in Orange County, within the Central District of California, and elsewhere, defendant ANASTASSIA KREZOUB, also known as "Sylvia Kass" ("KREZOUB"), knowingly and with the intent to extort money and other things of value from the Victim, transmitted in interstate commerce communications that contained a true threat to injure the reputation of the Victim and other individuals, that is, defendant KREZOUB threatened to distribute

//

//

//

1    sensitive and harmful information about the Victim and other

2    individuals, and defendant KREZOUB threatened to accuse the Victim of

3    a crime, if the Victim did not transfer money or other things of

4    value to defendant KREZOUB.

5                                        A TRUE BILL

6

7                                        _____/S/_____

8                                        Foreperson

9    E. MARTIN ESTRADA
     United States Attorney

10

11

12   ANNAMARTINE SALICK
     Assistant United States Attorney
13   Chief, National Security Division

14   CAMERON L. SCHROEDER
     Assistant United States Attorney
15   Chief, Cyber & Intellectual
     Property Crimes Section

16
     KHALDOUN SHOBAKI
17   Assistant United States Attorney
     Deputy Chief, Cyber &
18   Intellectual Property Crimes
     Section

19   ANDREW M. ROACH
20   Assistant United States Attorney
     Cyber & Intellectual Property
21   Crimes Section

22

23

24

25

26

27

28

# EXHIBIT G

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>   v.<br><br>ANASTASSIA KREZOUB,<br><br>       Defendant. | Case No.: SACR 23-00042-CJC<br><br><br>**ORDER DENYING IN SUBSTANTIAL PART GOVERNMENT'S REQUEST TO SEAL AND REDACT THE COURT'S SENTENCING MEMORANDUM [Dkt. 78] AND VICTIM'S MOTION FOR AMENDED SENTENCING MEMORANDUM [Dkt. 82]** |

## I.    INTRODUCTION

Between November 2021 and March 2023, Anastassia Krezoub, a French citizen in her early twenties without legal status in the United States, sent Victim,[1] an extremely

---

[1] Pursuant to an agreement between the government, Ms. Krezoub, and the victim in this case to keep the victim's identity anonymous, the Court refers to the victim as "Victim" rather than by way of initials.

wealthy businessman in his fifties, thousands of harassing, threatening, and extortionate messages through a variety of channels.  (*See* Dkt. 51 at 4–5.)  Many of these messages were graphic and vile.  (*See, e.g.*, Dkt. 65 at 1.)  For these criminal acts, Ms. Krezoub pleaded guilty to two crimes: cyberstalking in violation of 18 U.S.C. §§ 2261A(2)(B), 2261(b)(5) and extortion in violation of 18 U.S.C. § 875(d).  (Dkt. 52.)  On May 20, 2024, the Court sentenced Ms. Krezoub to time already served in custody (14 months), one year of supervised release, and a mandatory special assessment of $200.  (Dkt. 73.)  At her sentencing, the Court provided the parties a sentencing memorandum that explained the basis for Ms. Krezoub's sentence.  No party challenges that sentence, and final judgment against Ms. Krezoub has been entered.  To the Court's knowledge, Ms. Krezoub is currently in custody of Immigration and Customs Enforcement.

Portions of the Court's sentencing memorandum identified Ms. Krezoub's allegations against Victim, the context of those allegations, and evidence related to them.  As the Court laid out more fully in its sentencing memorandum, those circumstances factored into the Court's sentencing determination.  The government and Victim's counsel requested the opportunity to provide suggested redactions to the Court's sentencing memorandum before it was publicly docketed, so the Court postponed the docketing of its sentencing memorandum to hear from both the government and Victim.  *Cf. Kenna v. U.S. Dist. Ct. for C.D. Cal.*, 435 F.3d 1011, 1018 n.1 (9th Cir. 2006) ("We note, for example, that our task in crafting an effective remedy would have been greatly simplified, had the district court postponed [the defendant's] sentencing until the petition for writ of mandamus was resolved.  District courts may consider whether to routinely postpone final imposition of sentence in cases where they deny a request by victims to exercise rights granted by the CVRA.").

Now before the Court are the government's request to seal and redact the Court's sentencing memorandum and Victim's motion for an amended sentencing memorandum

pursuant to the Crime Victims' Rights Act ("CVRA"), 18 U.S.C. § 3771.  (*See* Dkts. 78, 82.)  Ms. Krezoub filed a partial opposition to replacing, sealing, or redacting the Court's sentencing memorandum.  (*See* Dkt. 84.)  After receiving the parties' positions, the Court immediately scheduled a hearing and heard argument.  (*See* Dkt. 85.)  For the following reasons, the government's request and Victim's motion are **DENIED IN SUBSANTIAL PART**.

## II.    DISCUSSION

"The criminal justice system has long functioned on the assumption that crime victims should behave like good Victorian children—seen but not heard.  The Crime Victims' Rights Act sought to change this by making victims independent participants in the criminal justice process.  The CVRA guarantees crime victims . . . different rights, and unlike the prior crime victims' rights statute, allows both the government and the victims to enforce them."  *Kenna*, 435 F.3d at 1013 (citations omitted).  At issue presently is Victim's "right to be treated with fairness and with respect for the victim's dignity and privacy."  18 U.S.C. § 3771(a)(8).

Victim and the government argue that the Court's sentencing memorandum violates Victim's rights under the CVRA because "[i]t gives credence to the very extortionate threats that resulted in [Ms. Krezoub's] criminal conviction."  (Dkt. 82 at 1; *see also* Dkt. 78 at 2–4.)  Victim and the government claim that the only way to preserve Victim's rights is to sanitize the sentencing memorandum, and either remove or redact all mention of Ms. Krezoub's allegations against Victim and other factors related to Victim's background and his relationship with Ms. Krezoub.  (*See* Dkt. 78 Ex. 1 [government's proposed redactions]; Dkt. 82 Ex. A [Victim's proposed revised sentencing memorandum]; *see also* Dkt. 84 at 4 ["Both proposals leave only 5 of the Court's original 17 pages untouched."].)  While the Court agrees with all parties that minor revisions to its

original sentencing memorandum could serve the intent behind the CVRA without running afoul of the First Amendment, the balance of Victim's and the government's requests would deprive the public of its rights and are not necessary under the CVRA.

As an initial matter, the Court addresses the revisions upon which the parties agree.[2]  The Court's original sentencing memorandum anonymized Victim, as is common practice, by use of his initials.  All parties agree that the use of "Victim" would more strongly promote anonymity.[3]  The Court agrees and finds that this ensures Victim's anonymity, greatly limiting any risk of reputational harm based on the Court's sentencing memorandum.  The Court is also comfortable describing Victim as a "businessman." (*See* Dkt. 78 at 1.)  While the Court's original sentencing memorandum described Victim's profession in very general terms, this even greater generality also helps ensure Victim's anonymity without impacting the public's ability to understand why the Court sentenced Ms. Krezoub to time served.  On its own, the Court also removes some dates which are not necessary to understanding the reasoning behind the sentencing memorandum.  Because, with the above revisions, the Court's sentencing memorandum does not contain information by which Victim can be readily identified, it respects Victim's "dignity and privacy."  18 U.S.C.A. § 3771(a)(8).

---

[2] In addition to the revisions related to Victim's identity, the Court also revises its sentencing memorandum to recognize its imposition of supervised release to further protect Victim at the government's request despite Ms. Krezoub's impending deportation.  *See* U.S.S.G. § 5D1.1(c) ("The court ordinarily should not impose a term of supervised release in which supervised release is not required by statute and the defendant is a deportable alien who will be deported after imprisonment.") The Court also adds minimal clarifications to make clear that Ms. Krezoub's allegations have not been proven.

[3] The Court notes that the text of the CVRA does not require the anonymity of an adult victim's identity. *See United States v. Neel*, 2022 WL 736100, at *1 (N.D. Okla. Mar. 10, 2022) ("Section 3771(a)(8) applies to adult victims but, significantly, does not require that documents disclosing victim or witness identities be filed under seal or otherwise redacted.")  Nevertheless, Victim's identity is not necessary for the public to understand Ms. Krezoub's sentence, so out of an abundance of caution for Victim's rights under the CVRA, the Court anonymizes its sentencing memorandum to the extent practicable while respecting the public's rights.

Despite Victim's anonymity, Victim and the government urge the Court to remove or redact essentially anything related to Victim or Ms. Krezoub's allegations against him. First, this ignores the fact that much of what Victim and the government apparently seek to keep out of the public eye is already part of the public record. As Ms. Krezoub points out, the publicly filed Complaint details the very same allegations that are referenced in the Court's sentencing memorandum. (*See, e.g.*, Dkt. 11 ¶¶ 5, 8(g), 9(c), 9(k), 9(n), 9(o), 13–14, 18.) "[I]f a document becomes part of the public record, the public has access to it, and the press may report its contents." *Phoenix Newspapers, Inc. v. U.S. Dist. Ct. for Dist. of Arizona*, 156 F.3d 940, 949 (9th Cir. 1998). And "if a court contemplates sealing a document or transcript, it must provide sufficient notice to the public and press to afford them the opportunity to object or offer alternatives. If objections are made, a hearing on the objections must be held as soon as possible." *Id.* Given much of the information that Victim and the government seek to keep off the public docket is already on the public docket, the Court's sentencing memorandum does not run afoul of the CVRA.

Second, and even more importantly, Victim's and the government's position ignores the public's right to know why the Court sentenced Ms. Krezoub as it did. "In this circuit, we start with a strong presumption in favor of access to court records." *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003). "Virtually all proceedings in district court are public in the sense that the papers and other materials may be viewed by anyone on request to the clerk's office." *Kenna*, 435 F.3d at 1015. "The rare exception involves cases where certain portions of the record are sealed. This can occur only *in rare and exceptional circumstances for compelling reasons*." *Id.* at 1015 n.3 (emphases added). Because the Court's sentencing memorandum maintains Victim's anonymity, respecting his dignity and privacy, the Court sees no compelling reason to keep from the public the Court's reasoning behind Ms. Krezoub's sentence. To hold otherwise would run afoul of fundamental First Amendment principles. *See Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty.*, 457 U.S. 596, 603–06 (1982) ("[P]ublic

access to criminal trials permits the public to participate in and serve as a check upon the judicial process—an essential component in our structure of self-government.").

Victim argues that certain aspects of Victim's personal life are irrelevant, or should be irrelevant, to Ms. Krezoub's sentencing. As explained in the sentencing memorandum, the Court found those details relevant—indeed, Ms. Krezoub's impact on Victim played a significant role in her sentence, and information about Victim was necessary to understand the extent of that impact. *See United States v. Endsley*, 2009 WL 385864, at *2 (D. Kan. Feb. 17, 2009) ("This court has presided over sentencing hearings that involved factual disputes over the impact suffered by the victim."); *id.* at n.1 ("The defendant here should have every reasonable opportunity to challenge the government's argument that the crime here had 'life-altering implications for the young victim.'"). And again, because the sentencing memorandum does not identify Victim, that anonymized information does not infringe on his rights under the CVRA.

Victim and the government also argue that the Court unfairly credited Ms. Krezoub's allegations. As is clear in the sentencing memorandum, Ms. Krezoub's allegations have never been proven before a jury. But the evidence presented to the Court for Ms. Krezoub's sentencing was indicative of her state of mind and what she believed Victim did to her. And Ms. Krezoub's allegations were, given the context, relatively internally consistent and consistent with a third-party's allegations against Victim.

Victim also complains that he has been deprived of the ability "to cross-examine his accusers, testify in his own defense, and avail himself of the Rules of Evidence to exclude inadmissible and inherently prejudicial evidence." (Dkt. 82 at 5–6; *see also id.* at 3 ["Victim is deprived of any meaningful opportunity to contest the 'charges' and clear his name"].) This complaint improperly conflates trial and sentencing. The evidence

presented for Ms. Krezoub's sentencing was rightly considered by the Court to impose a fair and just sentence. Strict compliance with the rules of evidence is not required at a defendant's sentencing. *See Pepper v. United States*, 562 U.S. 476, 489 (2011) ("Both Congress and the Sentencing Commission thus expressly preserved the traditional discretion of sentencing courts to conduct an inquiry broad in scope, largely unlimited either as to the kind of information they may consider, or the source from which it may come.") (cleaned up); *United States v. Mills*, 710 F.3d 5, 15 (1st Cir. 2013) ("[T]he court can consider all kinds of relevant information regardless of admissibility at trial (including hearsay that has never been tested by cross-examination), provided it has sufficient indicia of reliability to support its probable accuracy.") (internal quotation marks and citations omitted). The fact that some of the evidence might not have been admissible at trial is, therefore, of no legal consequence.

Third, Victim provides insufficient authority to overcome the important First Amendment issues his motion implicates (the government provides no authority other than the CVRA itself). The cases Victim cites in support of his motion are readily distinguishable. In *United States v. Robinson*, the court denied a newspaper's attempt to force the government to publicly disclose the victim's identity, which was unknown to the court. 2009 WL 137319, at *1–2 (D. Mass. Jan. 20, 2009). Critical to the court's reasoning, the requested information was not submitted to the court and did not "play[] a role in the adjudication process." *Id.* at 2. Similarly, in *United States v. Patkar*, the court rejected the Associated Press' request to dissolve a protective order that kept the victim's name and certain documents from being disclosed publicly because the documents at issue "were never submitted to the court" and were "not part of the judicial record of [the] case." 2008 WL 233062, at *3 (D. Haw. Jan. 28, 2008). Here, the information about Victim was submitted to the Court and played a significant role in the adjudication process. And again, Victim's identity is not made public in the Court's sentencing

memorandum—and most of the challenged content already appears in publicly filed documents.

Victim also cites *United States v. Bikikov* for the proposition that the Court should sanitize its sentencing memorandum because Ms. Krezoub could "exploit the challenged statements in the Draft to bludgeon whatever is left of the Victim's reputation." (Dkt. 82 at 7 [citing 2023 WL 6128190, at *2 (D. Idaho Sept. 19, 2023)].) Notably, *Bibikov* involved how "trademark holders identify counterfeit products," information that other criminals could use to commit crimes. In contrast here, the information related to Victim in the Court's sentencing memorandum does not provide other criminals a guide on how to commit crimes. Additionally, in imposing supervised release, the Court made clear to Ms. Krezoub that she cannot contact or otherwise threaten or intimidate Victim. Using the sentencing memorandum in that way would violate her terms of supervised release. And to the extent Ms. Krezoub may violate the terms of her supervised release, she is already aware of the information in the Court's sentencing memorandum (indeed, most of the disputed information involves her own allegations) and could spread such information without the sentencing memorandum. Contrary to Victim's assertions, none of Victim's authorities support the relief he seeks at the cost of the public's rights and the First Amendment.

For these reasons, the government's request and Victim's motion are **DENIED IN SUBSTANTIAL PART**. The Court will docket its sentencing memorandum with the limited revisions previously indicated. The parties shall immediately destroy all copies of the Court's original sentencing memorandum. To allow Victim and/or the government to seek a writ of mandamus from the Ninth Circuit, the sentencing memorandum will remain under seal for **FIVE** days, until **June 3, 2024**, at which time, barring instructions from the Ninth Circuit, the sentencing memorandum shall be publicly docketed. *See* 18 U.S.C. § 3771(d)(3); Fed. R. Crim. P. 45(a)(1); *see also In re Doe*, 50 F.4th 1247, 1253

(9th Cir. 2022) ("Given the natural reading of the text of § 3771(d)(3) and its history, we hold that the parties can agree to an extension of the 72-hour deadline with our approval, so long as the extension does not involve a stay or continuance of the underlying district court proceedings for more than five days.").

DATED:      May 28, 2024

_____
CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE